UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

GERARDO VAZQUEZ-MENTADO,

                Plaintiff,

      -against-                                5:12-CV-0797 (LEK/ATB)

BUITRON; *et al.*,

                Defendants.

## MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

In this civil rights action, Plaintiff Gerardo Vazquez-Mentado ("Plaintiff") asserts claims against various members of the U.S. Customs and Border Protections's Office of Border Patrol ("USBP") arising out of his arrest and detention on suspicion of being an alien illegally present in the United States. See generally Dkt. No. 43 ("Second Amended Complaint"). Presently before the Court is Buffalo Sector Chief Patrol Agent Kevin Oaks's ("Oaks") Motion to Dismiss Plaintiff's Fourth Amendment[1] Bivens[2] claims against him for failure to sufficiently allege personal involvement. Dkt. No. 51 ("Motion"). For the following reasons, the Motion is granted in part and denied in part.

---

[1] The introductory section of the Second Amended Complaint also references a Fifth Amendment Bivens claim. Second Am. Compl. ¶ 2. Plaintiff included this claim in his original Complaint but dropped it from his First Amended Complaint. See Dkt. No. 1 ¶¶ 2, 59. See generally Dkt. No. 26 ("First Amended Complaint"). However, this claim is not included in the section of the Second Amended Complaint enumerating Plaintiff's causes of action, see Second Am. Compl. ¶¶ 70-73, and Plaintiff acknowledges that this claim was "inadvertently re-inserted" and "will be deleted from the next amended complaint." Dkt. No. 57 ("Response") at 1 n.1. The Fifth Amendment Bivens claim against Oaks is therefore dismissed.

[2] Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

## II. BACKGROUND

The parties are presumed to be familiar with the background of this case. For a complete statement of Plaintiff's allegations and claims, reference is made to the Second Amended Complaint or to the Court's Memorandum-Decision and Order of May 28, 2013. Dkt. No. 41 ("May Order"). Plaintiff, a United States citizen, alleges that he was pulled over, arrested, and detained for a number of hours by USBP Buffalo Sector agents despite producing a valid New York driver's license. See generally Second Am. Compl.; May Order. The May Order denied a Motion to dismiss filed by the two named arresting agents but granted that Motion without prejudice as to Oaks, finding that the allegations regarding Oaks's involvement were too conclusory. See May Order at 17-18; First Am. Compl.; Dkt. No. 33. Plaintiff then filed the Second Amended Complaint and Oaks filed the present Motion, which argues that the factual allegations remain insufficient. See Dkt. No. 51-1 ("Memorandum"). Plaintiff filed the Response and Oaks a Reply. Dkt. No. 61 ("Reply").

## III. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also FED. R. CIV. P. 12(b)(6). Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. "[U]nadorned, the-defendant-unlawfully-harmed-me accusation[s]" do not suffice. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Thus, although a court must accept as true the factual allegations contained in a complaint and draw

all inferences in favor of a plaintiff, see Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006), an action is subject to dismissal where the court is unable to infer more than the "sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

IV.  DISCUSSION

 A. Supervisory Liability under Bivens

A defendant is liable under Bivens only where she is "personally involved in the claimed constitutional violation." Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009). "Because vicarious liability is inapplicable to Bivens . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. It has long been the law in this circuit that a supervisor's personal involvement may be found where she: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the wrong after being informed of the violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

However, the Supreme Court held in Iqbal that, at least where the constitutional violation is premised on discriminatory intent, "purpose rather than knowledge" is required for an "official charged with violations arising from his or her superintendent responsibilities." Iqbal, 556 U.S. at 677. Some district courts have extended this holding and found that the second, fourth, fifth, and part of the third Colon factors are no longer viable bases for liability in any context. See, e.g.,

3

Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801, 2009 WL 1835939, at *4, 6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other Colon categories impose the exact types of supervisory liability that Iqbal eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate."); Joseph v. Fischer, No. 08 Civ. 2824, 2009 WL 3321011, at *14 (S.D.N.Y. Oct. 8, 2009) ("[U]nder Iqbal, . . . [a] defendant is not liable . . . if the defendant's failure to act deprived the plaintiff of his or her constitutional right."); Newton v. City of New York, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims . . . have not survived the Supreme Court's recent decision in [Iqbal]."). The majority of district courts, however, have held that, absent any contrary directive from the Second Circuit, all five Colon factors survive where, as in the Fourth Amendment context, the constitutional violation at issue does not require a showing of discriminatory intent. See Liner v. Fischer, No. 11 Civ. 6711, 2013 WL 3168660, at *7 (S.D.N.Y. June 24, 2013) (agreeing with the "majority view" that where the constitutional claim does not require a showing of discriminatory intent, the personal-involvement analysis in Colon should still apply); Alli v. City of New York, No. 11 Civ. 7665, 2012 WL 4887745, at *6 (S.D.N.Y. Oct. 12, 2012) ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in Colon should still apply."); Toliver v. N.Y.C. Dep't of Corr., No. 10 Civ. 5804, 2012 WL 5426658, at *4 (S.D.N.Y. Oct. 10, 2012) ("[T]he majority view is where the constitutional claim does not require a showing of discriminatory intent . . . the personal involvement analysis set forth in Colon v. Coughlin may still apply." (quotation marks

4

omitted)); Wik v. Kunego, No. 11-CV-6205, 2012 WL 4801038, at *3 n. 3 (W.D.N.Y. Oct. 9, 2012); Stresing v. Agostmoni, No. 11-CV-967S, 2012 WL 2405240, at *4 (W.D.N.Y. June 25, 2012); Jackson v. Goord, No. 06-CV-6172 , 2011 WL 4829850, at *9 n. 21 (W.D.N.Y. Oct. 12, 2011) ("It is unclear whether Iqbal overrules or limits Colon, therefore, in the absence of contrary direction from the Second Circuit, the Court will continue to apply those factors." (citations omitted)); Qasem v. Toro, 737 F. Supp. 2d 147, 152 (S.D.N.Y. 2010) ("[T]he five Colon categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated."); Sash v. United States, 674 F. Supp. 2d 531 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply."). The Second Circuit has expressly declined to determine whether Iqbal eliminated any of the Colon bases for liability. See Hogan v. Fischer, No. 12-4246, 2013 WL 6697908, at *8 n.3 (2d Cir. Dec. 20, 2013); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013). The Court adopts the majority view and concludes that extension of Iqbal to the Fourth Amendment context is unwarranted. "[B]ecause Plaintiff has not asserted intent-based discrimination claims, but instead relies on claims under the Fourth . . . Amendment, the court examines the [Second] Amended Complaint to determine whether Plaintiff has adequately pled supervisory liability . . . under any of the five Colon factors." Kucera v. Tkac, No. 12-cv-264, 2013 WL 1414441, at *5 (D. Vt. Apr. 8, 2013).

### B. Policy or Practice

A supervisor may be liable under Bivens where she "created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873. Plaintiff contends that Oaks instituted and/or continued a reward policy ("Reward Policy") that incentivized arrests and that this policy led to a number of arrests without probable cause, including his own. See Resp. at 5-10; Second Am. Compl. ¶¶ 51-66. Plaintiff relies primarily on a report prepared by NYU Law School and Families for Freedom entitled "Uncovering USBP: Bonus Programs for United States Border Patrol Agents and the Arrest of Lawfully Present Individuals" ("Report") (available at http://familiesforfreedom.org/sites/default/files/resources/ Uncovering%20USBP-FFF%20 Report%202013.pdf) for the specific factual allegations underlying his claim.[3] See Resp. at 5-10; Second Amended Compl. ¶¶ 51-66. Oaks responds that Plaintiff has failed to sufficiently allege that the Reward Policy: (1) provided rewards for arrests; (2) led to any illegal arrests; or (3) led to Plaintiff's arrest. See Mem. at 9-12; Reply at 3-6.

  *1. Arrest-Incentivizing Policy*

Plaintiff alleges that Chief Oaks instituted and/or continued the Reward Policy, which rewards USBP Buffalo Sector agents with cash, vacation time, and gift cards for high arrest numbers but not for the legality of arrests. Second Am. Compl. ¶¶ 58-61. See generally Report. As evidence that the rewards were linked to arrest numbers, Plaintiff asserts that the only statistic tracked by the USBP Buffalo Sector was arrests, which were recorded daily and monitored closely. Second Am. Compl. ¶ 59 (citing Report at 8). It is entirely plausible that rewards were given out based on the only monitored and recorded performance statistic.

As evidence that rewards were not tied to arrest totals, Oaks points to the Report's

---

[3] The Court may consider the Report because it was incorporated by the Second Amended Complaint. Taylor v. Vt. Dept. of Educ., 313 F.3d 768, 776 (2d Cir. 2002) (noting that, in deciding a motion to dismiss, a court can consider "documents incorporated by reference in the complaint").

acknowledgment that: (1) from 2008 to 2010, there was an inverse correlation between total annual cash rewards issued and arrest numbers; and (2) the claims of USBP Buffalo Sector agents and senior personnel that the awards were handed out based on general "quality of work" and that no set reward criteria existed. See Mem. at 12 (citing Report at 5-7). While both may bear upon the overall weight of the evidence, neither is sufficient to render Plaintiff's allegations implausible. Unrelated external circumstances, such as fewer illegally present aliens or USBP agents, might lead to lower overall arrest totals even as total annual rewards increased.[4] And that certain USBP Buffalo Sector personnel have stated that there were no formal reward criteria does not conclusively demonstrate that arrest totals were not, either formally or informally, the basis for rewards.[5]

  2. *Policy-Caused Illegal Arrests*

Plaintiff contends that, as a result of the Reward Policy, "twelve U.S. citizens, and 278 other lawfully present persons," including a U.S. citizen who produced a valid state driver's license, were arrested by Rochester[6] USBP agents from 2006 to 2010. Second Am. Compl. ¶¶ 51, 63 (citing

---

[4] Moreover, changes in the structure of the Reward Program itself might lead to less overall arrest incentivization even as the total reward amount increased.

[5] Oaks also suggests that Plaintiff's allegation that Oaks established the Reward Policy is purely conjectural. See Reply at 3-4. This is not so. The Report provides historical reward amounts indicating that the Reward Program likely began in 2003. See Report at 5-7. Plaintiff alleges, and provides a supporting press release indicating, that Oaks became Chief Patrol Agent some time before 2009. See Second Am. Compl. ¶ 53; id. Ex. E. Thus, it is entirely plausible that Chief Oaks was the Chief Patrol Agent in 2003. It is also entirely plausible that if he was, he, as the head of the USBP Buffalo Sector, established the Reward Policy.

Moreover, even if Chief Oaks did not establish the Reward Policy, it indisputably continued during his tenure. As noted *supra*, "[a] supervisory official may be liable [not only] because he or she created a policy or custom under which unconstitutional practices occurred, [but also because he or she] allowed such a policy or custom to continue." (quotation marks and citation omitted)). Scott v. Fischer, 616 F.3d 100, 108-09 (2d Cir. 2010).

[6] As discussed *infra*, the Rochester station is part of the USBP Buffalo Sector.

7

Report at 10). Oaks responds that Plaintiff has not alleged or demonstrated that any of these arrests were without probable cause. Mem. at 10, 13-14. But the Report indicates that many of these arrests may have been based on no more than suspects' behavior or mannerisms entirely consistent with fear of law enforcement; absence or presence in certain allegedly outdated and incomplete immigration databases; failure to provide documentation affirmatively demonstrating legal immigration status; and foreign accents and/or names. See Report at 10-26. While Plaintiff has certainly not proven that any of these arrests were without probable cause, he has offered a plausible basis to so conclude. See Florida v. Royer, 460 U.S. 491, 507 (1983) (finding no probable cause where suspect had a "nervous" affect); U.S. v. Munoz, No. CR 12-4009, 2012 WL 6012811, at *4 (D.S.D. Dec. 3, 2012) ("[The] inability to produce . . . a document that shows proof of legal presence in the United States does not give rise to a reasonable suspicion that [defendant] was an illegal immigrant."); id. ("Therefore, the fact that [defendant] spoke 'broken English,' does not produce a reasonable suspicion that he is an illegal immigrant." (citation omitted)); United States v. Brignoni–Ponce, 422 U.S. 873, 886 (1975) (being of Mexican descent does not justify a reasonable belief that one is an alien); Aguilar v. Immigration and Customs Enforcement Div., 811 F. Supp. 2d 803, 826-29 (S.D.N.Y. 2011) (finding standing to seek injunctive relief where agents relied on outdated and incomplete immigration databases). Plaintiff also points to one incident where, as in his case, the suspect produced a valid driver's license. This also suggests a lack of probable cause. See U.S. v. William, No. 2008-016, 2008 WL 4587250, at *6 (D.V.I. Oct. 10, 2008) (noting that, where officers performed an investigatory stop to determine whether the passengers of the truck had made an illegal entry, "there was no longer any reasonable suspicion to believe that the occupants of the truck were illegal immigrants" once the driver produced a valid driver's license); cf. U.S. v.

8

Huerta, 247 F. Supp .2d 902, 911 (S.D. Ohio 2002) (noting that the "lack of a valid drivers license contributes to a finding of probable cause").[7] This is particularly so where, as in Plaintiff's and this other suspect's case, the license-issuing state requires the production of valid immigration documents. See May Order at 10 n.6; Dkt. No. 40-1 at 40.[8]

Finally, Oaks contends that even if these arrests were without probable cause, Plaintiff has failed to sufficiently allege that they were caused by the Reward Policy. But the causal link between the Reward Policy and the illegal arrests is founded on the reasonable and well accepted proposition that you get what you pay for. It is altogether plausible that some causal relationship exists between: (1) a policy that exclusively or primarily rewards high arrest numbers; and (2) a number of ensuing arrests without probable cause—alas, where one thing (making arrests) is rewarded and another (avoiding arrests without probable cause) is not, law enforcement officers will tend to do more of the former and less of the latter. See Connally v. Georgia, 429 U.S. 245, 250 (1977) (striking down scheme where magistrate received compensation for issuing search warrant but went unpaid if he did not and noting the "temptation" inherently present because the magistrate's "financial welfare . . . is enhanced by positive action and is not enhanced by negative action"); see also DuPont v. United States, 234 F. Supp. 68, 685 (D. Del. 1964) (noting that "a desire to make money . . . [may] induce one to pursue a particular activity."). Of course, there is nothing inherently

---

[7] Indeed, even the most xenophobic and constitutionally problematic state laws have recognized that possession of a valid driver's license often negates probable cause. See Arizona v. United States, 132 S.Ct. 2492, 2507 (2012) (noting that Arizona's S.B. 1070 provides that "a detainee is presumed not to be an alien unlawfully present in the United States if he or she provides a valid Arizona driver's license or similar identification"); United States v. Alabama, 443 F. App'x 411, 415 (11th Cir. 2011) (noting that Alabama's H.B. 56 provides that "[a] person is presumed not to be an alien who is unlawfully present if the alien presents a valid driver's license").

[8] The pagination corresponds to the page numbers assigned by ECF.

9

problematic about setting high arrest targets. See Argueta v. U.S. Immigration and Customs Enforcement, 643 F.3d 60, 75 (3d Cir. 2011) ("[A] federal official specifically charged with enforcing federal immigration law appears to be acting lawfully when he or she increases arrest goals."). Nevertheless, a Fourth Amendment violation is stated where, as here, a plaintiff alleges that high arrest totals were incentivized with significant financial rewards, those incentives were not counteracted by rewards aimed at ensuring the legality of arrests, and a pattern of illegal arrests (including the plaintiff's) resulted.

### 3. Causal Link to Plaintiff's Arrest

Oaks argues that Plaintiff has not alleged that the Reward Policy led to Plaintiff's arrest. See Reply at 4. But a holistic reading of the Second Amended Complaint reveals just such an allegation. See Second Am. Compl. ¶¶ 19, 22-23, 25, 29-30, 35-36, 45, 48, 49 (alleging that Plaintiff was arrested without probable cause); 57-59 (describing the Reward Policy); 65 (alleging that Oaks promulgated policies, including the Reward Policy, which resulted in the "violations set forth herein"). Moreover, Plaintiff alleges in his Response that Oaks "paid [agents] extra for the arrests they did make" and that the "[R]eward [P]olicy resulted in [Plaintiff's] arrest." Resp. at 8; see also Canadian St. Regis Band of Mohawk Indians v. New York, No. 82-CV-0783, 2013 WL 3992830, at *7 (N.D.N.Y. July 23, 2013) (Kahn, J.) ("[W]here a complaint already includes a claim, a court addressing a motion to dismiss the claim may use [a plaintiff's] brief to clarify allegations in her complaint whose meaning is unclear." (quotation marks omitted)).

Oaks responds that even if Plaintiff has alleged a causal relationship between the Reward Policy and his arrest, he has not done so sufficiently. Oaks notes that all of the arrests to which Plaintiff points were performed by agents working out of the USBP Rochester station, not the

Oswego station out of which the USBP officers who arrested Plaintiff worked. See Mem. at 14. According to Oaks, the USBP Buffalo Sector is comprised of six stations that span a total of 450 miles, 25 counties, and two states. See id. at 7, 9-10. He thus implies that the putative tendency of Rochester agents to arrest without probable cause has little bearing on the tendency of Oswego agents to do so. But even if the Court were to take judicial notice of the size and makeup of the USBP Buffalo Sector, Plaintiff's causation allegations would suffice. It is entirely plausible that, if officers in one USBP Buffalo Sector station were induced by the Reward Policy to frequently arrest without probable cause, officers in another were as well. While some geographical areas may be so disparate that misconduct by officers in one has no bearing on misconduct in the other, see Aguilar, 811 F. Supp. 2d at 817 (dismissing claim against "officials at the highest level of government in charge of overseeing a bureaucracy of tens of thousands of people, [who] had access to information indicating that a handful of field agents in *disparate locations around the country* had engaged in constitutionally infirm practices."(emphasis added)); Argueta v. U.S. Immigration and Customs Enforcement, 643 F.3d 60, 74 (3d Cir. 2011) (dismissing claim premised on reports of subordinate misconduct in one state followed by misconduct by totally different subordinates in a *completely different state*"(emphasis added)), the putative size of the USBP Buffalo Sector, and its division into a mere six stations, is insufficient to render arrests in one station irrelevant to arrests in another.

### C. Failure to Train and/or Supervise

The second basis for Plaintiff's claim against Oaks is premised on Oaks's putative failure to supervise and/or train. See Resp. at 5 (noting that the second ground for the claim against Oaks is that his "supervisory and training practices, in particular his response to a prior similar incident, led to [Plaintiff's] arrest." (citing Second Am. Compl. ¶¶ 50-56, 62-64)); Resp. at 10 (describing

11

Plaintiff's claim as a "TRAINING/SUPERVISION CLAIM").

Claims premised on putatively deficient supervision and/or training are generally analyzed pursuant to the deliberate indifference Colon factor. See Davis v. City of New York, No. 10 Civ. 0699, 2013 WL 1288176, at *5 (S.D.N.Y. Mar. 28, 2013); Arqueta, 643 F.3d at 62 (analyzing inadequate training and supervision claim pursuant to deliberate indifference factor); Mimms v. Carr, No. 09-CV-5740, 2011 WL 2360059, at *13 (E.D.N.Y. June 9, 2011) ("Where a plaintiff alleges the violation of a constitutional right resulting from a supervisory official's failure to train subordinates, he must prove . . . that the official was deliberately indifferent to the need to train subordinates as to their obligation not to violate the constitutional right at issue.").

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 131 S.Ct. 1350, 1360 (2011). "Deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (alterations and internal citations and quotation marks omitted).

Plaintiff alleges that, despite being aware of a pattern of unconstitutional arrests, Oaks either trained and supervised, or failed to train and supervise, the officers who arrested Plaintiff "in a manner adequate to prevent" Plaintiff's unconstitutional arrest. Second Am. Compl. ¶ 62. For many of the same reasons discussed *supra,* Plaintiff has met the plausibility standard. Plaintiff alleges that his arrest was illegal, in part, because: (1) he presented a valid driver's license; and (2) the arresting agents made no efforts to ascertain the validity of his license. See generally Second Am. Compl.; May Order. As discussed *supra*, Plaintiff has pointed to one other incident

12

where USBP Buffalo Sector agents committed the same putative error. See May Order at 16. While this one incident might not suffice to demonstrate a pattern of similar constitutional violations by untrained or unsupervised employees, Plaintiff has, as discussed *supra*, also pointed to a host of putatively illegal arrests involving other errors arguably at issue in his own arrest, including the presumption that Hispanic names or accents indicate illegal presence, the placement of a burden on a suspect to provide documentation affirmatively demonstrating legal presence, and overreliance on incomplete and inadequate immigration databases. See generally May Order; Second Am. Compl. (discussing the alleged circumstances of Plaintiff's arrest). Plaintiff has also sufficiently alleged that Oaks was aware of these arrests; he contends that all USBP Buffalo agents completed "I-44 forms" regarding the facts giving rise to stops and arrests and that Oaks personally reviewed each report. Id. ¶ 54.

Oaks correctly notes that Plaintiff has not fleshed out precisely what training or supervision should have been provided. See Mem. at 13-15. But he need not do so now. The pattern of similar putatively illegal arrests—all of which appear, on their face, to be remediable with proper supervision or training—combined with Oaks's knowledge of the facts underlying those arrests, is sufficient to plausibly suggest that Oaks was deliberately indifferent. Moreover, Oaks's mental state with respect to the Reward Policy bears upon his deliberate indifference with respect to the supervision and training claim: his institution and/or continuation of a policy that contributed to many of the illegal arrests at issue suggests that, at a minimum, he may have been deliberately indifferent to the role inadequate training and supervision played in those arrests.

The viability of Plaintiff's policy theory weighs against dismissal of Plaintiff's training and/or supervision theory for another reason: the Reward Policy and Oaks's putative supervisory

13

and/or training shortcomings are not necessarily distinct wrongs. It may well be that the interaction of the two led to the alleged pattern of unconstitutional arrests that culminated in Plaintiff's.[9] See, e.g, Diaz-Bernal v. Myers, 758 F. Supp.2d 106, 131 (D. Conn. 2010) ("[T]he plaintiffs have put forth a plausible claim that Myers and Torres are subject to supervisory liability because their actions imposing intense pressure to make arrests . . . and providing inadequate training created a policy under which constitutional violations occurred."). Rather than prematurely cabining Plaintiff's theory into one exclusively premised on the Reward Policy, the Court permits him to explore the interaction between the Reward Policy and the putative training and/or supervisory shortcomings.

**D. Qualified Immunity**

Oaks also argues that Plaintiff's claims against him should be dismissed on qualified-immunity grounds. The doctrine of qualified immunity protects government officials from liability for civil damages as long as their conduct does not "violate clearly-established rights of which an objectively reasonable official would have known." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999); see also Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000). However, a defendant may still be protected by qualified immunity if she violated an individual's constitutional rights, but "it was objectively reasonable [for her] to believe that [her] acts did not violate these clearly established rights." Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (quoting Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir. 2010)) (internal quotation marks omitted); see also Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012). Thus, as a matter of law, a government defendant is

---

[9] For example, the combination of the incentive to arrest provided by the Reward Policy and inadequate training regarding driver's licenses and immigration databases may have led to Plaintiff's arrest.

entitled to qualified immunity if

> "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (quoting Halperin v. Kissinger, 807 F.2d 180, 189 (D.C. Cir. 1986)). The party invoking qualified immunity bears the burden of offering proof that it was objectively reasonable for her to believe that her actions did not violate a clearly established right and that she is entitled to qualified immunity. See Young v. Selsky, 41 F.3d 47, 54 (2d Cir. 1994).

Oaks first argues that he is entitled to qualified immunity because his conduct did not violate Plaintiff's constitutional rights. See Mem. at 16-17. As discussed *supra*, the Court finds that Plaintiff has sufficiently alleged that it did. See Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested . . . without probable cause has, of course, long been a clearly established constitutional right."); Cannon v. Macon County, 1 F.3d 1558, 1563 (11th Cir. 1993) (recognizing a "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release").

Oaks next asserts that no objectively reasonable government official could know that the Reward Policy "would necessarily lead to constitutional violations." Mem. at 18; see also Reply at 9-10. For the reasons discussed *supra*, the Court finds that a jury might well determine that it was unreasonable for an official to conclude that a reward policy incentivizing only high arrest numbers would not lead to unconstitutional arrests—particularly where that official was made aware of a host of ensuing arrests without probable cause. As to the training and supervision claim, Oaks argues only that he acted reasonably because "the I-44 documentation policy . . . [was] instituted . . . to

15

create greater accountability and oversight." Mem. at 18. But the Court cannot conclude that the mere introduction of additional reporting conclusively demonstrates the reasonableness of Oaks's conduct. Moreover, Plaintiff does not allege that the introduction of the I-44 reports was actionable or otherwise problematic. See Resp. at 14. Rather, he argues that the reports made Oaks aware of the host of putatively illegal arrests his subordinates were performing and the training and/or supervision deficiencies responsible for those arrests. See id. at 14-15. For the reasons discussed *supra*, the Court cannot conclude that, as a matter of law, Oaks acted reasonably in failing to provide necessary training or supervision despite that knowledge.

### E. Declaratory Relief

Oaks also seeks dismissal of Plaintiff's claims against him to the extent they seek declaratory relief. See Mem. at 19; see also Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007) ("The only remedy available in a Bivens action is an award for monetary damages from defendants in their individual capacities."). Plaintiff does not oppose this request. See Resp. at 1. The claim for declaratory relief is therefore dismissed.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Motion (Dkt. No. 51) to dismiss is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that, to the extent it seeks dismissal of Plaintiff's Fifth Amendment Bivens claim and claim for declaratory relief, the Motion (Dkt. No. 51) to dismiss is **GRANTED**; and it is further

**ORDERED**, that the Motion (Dkt. No. 51) to dismiss is otherwise **DENIED**; and it is

16

further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: January 29, 2014
Albany, NY

_____
Lawrence E. Kahn
U.S. District Judge